21-2547; 21-2576
*In re TransCare Corporation*

# United States Court of Appeals
# For the Second Circuit

_____

August Term 2022

Argued: December 16, 2022
Decided: August 28, 2023

_____

Nos. 21-2547, 21-2576

IN RE: TRANSCARE CORPORATION,

*Debtor*.

**************************************

SALVATORE LAMONICA, AS CHAPTER 7 TRUSTEE OF THE JOINTLY-ADMINISTERED
ESTATES OF TRANSCARE CORPORATION, ET AL.,

*Plaintiff-Appellee*,

SHAMEEKA IEN,

*Plaintiff*,

*v.*

LYNN TILTON,

*Defendant-Appellant*,

1

21-2547; 21-2576
*In re TransCare Corporation*

PATRIARCH PARTNERS AGENCY SERVICES, LLC, PATRIARCH PARTNERS, LLC, PATRIARCH PARTNERS MANAGEMENT GROUP, LLC, ARK II CLO 20011, LIMITED, ARK INVESTMENT PARTNERS II, L.P., LD INVESTMENTS, LLC, PATRIARCH PARTNERS II, LLC, PATRIARCH PARTNERS III, LLC, PATRIARCH PARTNERS VIII, LLC, PATRIARCH PARTNERS XIV, LLC, PATRIARCH PARTNERS XV, LLC, TRANSCENDENCE TRANSIT, INC., TRANSCENDENCE TRANSIT II, INC.,

*Defendants.*

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

PATRIARCH PARTNERS AGENCY SERVICES, LLC, TRANSCENDENCE TRANSIT, INC., TRANSCENDENCE TRANSIT II, INC.,

*Appellants,*

*v.*

SALVATORE LAMONICA, AS CHAPTER 7 TRUSTEE OF THE JOINTLY-ADMINISTERED ESTATES OF TRANSCARE CORPORATION, ET AL.,

*Trustee-Appellee.*[*]

───────────────────────────

Appeals from the United States District Court
for the Southern District of New York
Nos. 20-cv-6523 & 20-cv-6274, Lewis A. Kaplan, *Judge.*

───────────────────────────

---

[*] The Clerk of Court is respectfully directed to amend the captions accordingly.

2

21-2547; 21-2576
*In re TransCare Corporation*

Before:        MENASHI, NATHAN, and MERRIAM, *Circuit Judges.*

Lynn Tilton was the sole director and indirect owner of TransCare Corp. When TransCare was on the brink of bankruptcy, Tilton created a plan to sell the profitable parts of the business to herself. She directed Patriarch Partners Agency Services, LLC, a company she controlled, to foreclose on the TransCare assets associated with its profitable business lines. Patriarch Partners Agency Services then sold those assets to two other companies that she created and controlled. What remained of TransCare filed for Chapter 7 bankruptcy.

Both the bankruptcy court and the district court agreed that (1) Tilton had breached her fiduciary duties by engaging in a self-interested transaction that failed to meet the entire fairness standard, and (2) the foreclosure on TransCare's assets was an actual fraudulent conveyance. The district court calculated that Tilton and her companies owed TransCare's bankruptcy estate a combined total of $39.2 million in damages.

We find no error in the determination of the bankruptcy and district courts that Tilton breached her fiduciary duties to TransCare and engaged in an actual fraudulent transfer. Tilton did not meet her burden to prove fair dealing or fair price with respect to the sale of the TransCare assets, and nearly every badge of fraud was present in the transfer. We also find no clear error in the damages award, which was based on the projected future earnings of the TransCare assets that Tilton had sold to herself. Accordingly, we **AFFIRM**. Judge Menashi dissents in part in a separate opinion.

————

MARK A. PERRY, Weil, Gotshal & Manges LLP, Washington, DC (Michael T. Mervis, Proskauer Rose LLP, New York, NY, Kellam M. Conover, Gibson Dunn & Crutcher LLP, Washington, DC, *on the brief*), *for Appellants*.

CARTER G. PHILLIPS, Sidley Austin LLP, Washington, DC (Avery Samet, Amini LLC, New York, NY, William R. Levi, Aaron P.

Haviland, Sidley Austin LLP, Washington, DC, *on the brief*), *for Appellees*.

_____

NATHAN, *Circuit Judge*:

This case arises from a transaction executed by Lynn Tilton, a private equity investor and the sole director of TransCare Corporation. When TransCare was on the verge of bankruptcy, Tilton hatched a plan to salvage the profitable parts of the business and spin them off into a new company. She directed Patriarch Partners Agency Services, LLC (PPAS), a company she controlled, to foreclose on select TransCare assets associated with TransCare's profitable business lines. PPAS then sold those assets to two other companies that Tilton created and controlled: Transcendence Transit, Inc. and Transcendence Transit II, Inc. (collectively, Transcendence). What remained of TransCare filed for Chapter 7 bankruptcy.

However, Tilton's plan fell apart when the new business was unable to get off the ground. Transcendence shut down after only three days and its assets were returned to the bankruptcy estate, where they were liquidated.

In the bankruptcy proceedings below, the bankruptcy court and the district court agreed that (1) Tilton had breached her fiduciary duties to TransCare by

4

engaging in a self-interested transaction that failed to meet the entire fairness standard, and (2) the foreclosure on TransCare's assets was an actual fraudulent conveyance. The district court calculated that Tilton, PPAS, and Transcendence owed the bankruptcy estate a combined total of $39.2 million in damages, based on the projected future earnings of the profitable TransCare assets that Tilton had transferred to Transcendence. Tilton, PPAS, and Transcendence appeal the judgments. For the reasons explained below, we **AFFIRM**.

## BACKGROUND

### I. Ownership and Debt Structure

TransCare, a Delaware corporation headquartered in New York, contracted with hospitals and municipalities in the mid-Atlantic region to provide ambulance and paratransit services. The company's board consisted of a single member, Lynn Tilton, who was also the indirect owner of about 61% of its equity. Two of Tilton's personal investment vehicles—Ark II CLO 2001-1, Ltd. (Ark II) and Ark Investment Partners II, LP (AIP)—owned 55.7% and 5.6% of TransCare's stock, respectively. Credit Suisse owned and/or managed about 26% of TransCare, and the remaining 12.7% was owned by various individuals and entities. As the sole

director, Tilton maintained ultimate control over all of TransCare's significant financial and operational decisions.

TransCare had two lines of credit that are relevant to this action. The parties refer to these credit agreements as the "Asset-Backed Loan" and the "Term Loan." The Asset-Backed Loan was a revolving loan facility from Wells Fargo. The Term Loan was a credit agreement between TransCare and several entities, including (1) AIP, (2) the "Zohar Funds," a group of three funds that were controlled by Tilton but funded by outside investors, (3) Credit Suisse, and (4) First Dominion Funding I (collectively, the Term Loan Lenders). PPAS acted as the administrative agent on behalf of all the Term Loan Lenders, and Tilton was the sole manager and indirect owner of PPAS.

Both the Term Loan and the Asset-Backed Loan were backed by blanket liens on TransCare's assets, but PPAS and Wells Fargo entered into an intercreditor agreement granting the Term Loan Lenders "a first priority lien on TransCare's vehicles, certain other physical assets, capital stock of the subsidiaries, and intellectual property," and Wells Fargo "a first priority lien on all other assets . . . , including the accounts (such as accounts receivable) and general intangibles."

*Lamonica v. Tilton (In re TransCare Corp.)*, Nos. 20-cv-6274 & 20-cv-6523, 2021 WL 4459733, at *3 (S.D.N.Y. Sept. 29, 2021) (hereinafter Distr. Op.).

## II. Financial Troubles

By the end of 2014, TransCare began to experience serious financial problems that affected its ability to continue operating. Throughout the following year, TransCare struggled to pay employees and vendors and "depended on Tilton affiliates to cover shortfalls." *Ien v. TransCare Corp. (In re TransCare Corp.)*, 614 B.R. 187, 210 (Bankr. S.D.N.Y. 2020). On October 14, 2015, Wells Fargo issued a notice of non-renewal and informed TransCare that the Asset-Backed Loan would expire, with the outstanding balance of $13 million due by January 31, 2016. At the time, TransCare also owed approximately $43 million on the Term Loan.

Thus, by mid-December 2015, "Tilton understood that Wells Fargo was not going to stay in past January 31 absent a sale process." *Lamonica v. Tilton* (*In re TransCare Corp.*), No. 18-1021, 2020 WL 8021060, at *6 (Bankr. S.D.N.Y. July 6, 2020) (hereinafter Bankr. Op.). As part of the sale process, a credit officer at Tilton's investment firm, Patriarch Partners, LLC (a separate legal entity from PPAS), identified comparable acquisitions and public companies that were similar to TransCare. The analysis found that the similar companies had been valued at

approximately eight to eleven times their annualized earnings before interest, taxes, depreciation, and amortization (EBITDA).

Tilton also asked her team to prepare a 2016 budget that would convince Wells Fargo to extend the Asset-Backed Loan while she looked for a potential buyer. Wells Fargo acknowledged that a sale of TransCare would require bridge financing to keep the company afloat until a deal was closed, but it conditioned its extension of the Asset-Backed Loan on a requirement that Patriarch Partners, LLC contribute to critical operating expenses. As part of the negotiations with Wells Fargo, Tilton also agreed to retain Carl Marks Advisory Group LLC to serve as a third-party financial advisor and to help with the budgeting process.

Throughout 2015, TransCare had received several offers from other ambulance companies to acquire certain assets and contracts. In particular,

- In February 2015, National Express offered $15 to $18 million to buy TransCare's paratransit services contract with the New York Metropolitan Transit Authority (MTA).
- In March 2015, the Richmond County Ambulance Service (RCA) emailed Tilton seeking to purchase some or all of TransCare for up to eight times TransCare's EBITDA.
- In July 2015, RCA sent a follow-up email reiterating its interest in purchasing or operating TransCare.
- Also in July 2015, National Express sent Glenn Leland, TransCare's CEO, a Letter of Intent offering to purchase the MTA contract for $6 to $7 million and assume up to $2 million in liabilities.

- In December 2015, National Express contacted Leland again to reiterate that its offer to buy the contract was "still out there."  Bankr. Op. at *6.
- Also in December 2015, another member of Tilton's team informed her "that Leland had received unsolicited calls from several potential purchasers in the ambulance business including Falck, [American Medical Response], RCA, and Enhanced Equity."  *Id.* at *7.

However, Tilton never pursued any of these opportunities and prohibited her employees from speaking to potential buyers.  Leland testified that when he informed Tilton about the February 2015 offer from National Express, he "was called to Lynn Tilton's office," where "she came in and told me, 'Don't ever [expletive] sell one of my companies.'"  Joint App'x 273.  When asked why she did not consider these offers, Tilton explained that she wanted to "try to get the company back" to "the $12 to $14 million dollars of EBITDA a year" that it had historically earned so she could sell the company "at a price that would have covered both Wells and the term loan lenders."  *Id.* at 679–80.

After the bridge financing was secured, TransCare's managers worked to determine how much capital TransCare would need to survive until a sale.  On January 27, 2016, Carl Marks produced a "2016 Plan Executive Summary" concluding that TransCare was "operating at an absolute breaking point."  Joint App'x 1680–81.  It determined that Patriarch Partners would need to pledge over $7.5 million to keep TransCare afloat, with $3.5 million needed in the next two

9

weeks. *Id.* at 1684. Tilton considered but ultimately rejected this plan because she did not "want to keep funding into a black hole that cannot be filled." *Id.* at 1668–69. As of February 3, 2016, TransCare still had no agreement with Wells Fargo or Credit Suisse for a new line of credit and was in default on the Term Loan.

Thus, by February 5, 2016, Tilton determined based on TransCare's "rapidly deteriorating condition" that the sale of the entire company was not feasible. Bankr. Op. at *18. The bankruptcy court found that Tilton's decisions up to this point were made in good faith and protected by the business judgment rule, and neither party has challenged this conclusion on appeal. *See id.*

## III.     The Tilton Plan

After further discussions with Carl Marks failed to produce a solution, Tilton directed her staff to build a business model that could continue a version of TransCare under a new company. The "Tilton Plan" involved splitting TransCare into two entities, which were referred to for planning purposes as "OldCo" and "NewCo." PPAS, as the agent acting on behalf of the Term Loan Lenders, would foreclose on part of the Term Loan Lenders' priority collateral; that collateral would then be transferred to NewCo. The plan was for NewCo to operate the most profitable divisions of TransCare as a going concern, while the remainder of

10

21-2547; 21-2576
*In re TransCare Corporation*

TransCare—aka OldCo—would wind down for 60 to 90 days and then file for bankruptcy. Tilton thus created two new Delaware corporations that would serve as "NewCo": Transcendence Transit, Inc. and Transcendence Transit II, Inc. (collectively, Transcendence).

Tilton also procured a new source of financing to support TransCare while the Plan was being implemented. Ark II, her personal investment fund, extended a $6.5 million loan to TransCare that was secured by a blanket lien on TransCare's assets. Although Tilton's team "had not received Credit Suisse's consent to subordinate its lien in connection with the Term Loan, Tilton signed an intercreditor agreement on behalf of PPAS . . . that granted Ark II structural and payment priority over the Term Loan Lenders, including Credit Suisse." Distr. Op. at *5. Despite already having subordinated Credit Suisse's position, Tilton directed her team to send an email to Credit Suisse "warning that TransCare was going to be forced to file for bankruptcy because Credit Suisse would not agree to subordinate its Term Loan position." *Id.*; *see also* Joint App'x 432–34. "Credit Suisse indisputably was not informed about the planned foreclosure" on the Term Loan Priority Collateral. Distr. Op. at *5.

11

21-2547; 21-2576
*In re TransCare Corporation*

Once the Plan was set, Tilton instructed her team to contact insurance brokers.  In one email explaining Transcendence's business model to an insurance broker, Tilton stated:

> [T]here is a smaller, less risky transit business that we would like to continue in a new company.  This would include our NY Transit business [providing paratransit services to the MTA] and our suburban ambulance businesses in Hudson Valley, Pittsburgh Pennsylvania and Maryland.
> . . .
> The models show that this business in 2016 would [have] approximately . . . $4mm of EBITDA and would grow with the additional transit business under the contract to . . . $7mm of EBITDA in 2017.  It is because this new business makes sense that I would be providing all the new working capital for this business myself, personally.

Joint App'x 1438.  A "Transcendence Go Forward Model" prepared by Tilton's team assumed that Transcendence would operate six divisions of TransCare: paratransit, Pittsburgh, Hudson Valley, Maryland, Westchester, and Bronx 911/Montefiore 911.  *Id.* at 2012–13.

On February 24, 2016, after Transcendence had obtained insurance, the Tilton Plan was put into motion.  Shortly after midnight, Tilton authorized foreclosure on the "Subject Collateral," which included all of TransCare's personal property (including servers and related data), three contracts, and the stock of

12

three subsidiaries: TransCare Pennsylvania, Inc., TC Hudson Valley Ambulance Corp., and TC Ambulance Corp. Joint App'x 1479. Tilton's team then directed PPAS to accept the Subject Collateral in satisfaction of $10 million out of the $43 million balance on the Term Loan.

Tilton had arrived at a purchase price of $10 million based on the December 2015 book value of the six divisions that NewCo would operate under the Transcendence Go Forward Model. However, before the foreclosure took place TransCare lost several valuable contracts with Bronx Lebanon, Montefiore Hospital, and the University of Maryland. As a result, Tilton decided not to purchase the Bronx911/Montefiore911, Westchester, and Maryland operations. Even though this drastically lowered the book value of the Subject Collateral, Tilton did not adjust the $10 million purchase price. Her team provided an updated financial model based on these reductions that projected a $4 million annualized EBITDA.

That same morning—February 24, 2016—PPAS transferred the Subject Collateral to Transcendence in exchange for $10 million. Though Transcendence never issued any equity, Tilton testified at trial that it was her intent for Ark II to own 55% of Transcendence (the same amount it owned in TransCare) and to give

the other Term Loan Lenders the remaining 45%. *See id.* at 770–73; *see also* Distr. Op. at *7. Later that day, TransCare and its remaining subsidiaries filed for Chapter 7 bankruptcy.

The Tilton Plan began to encounter obstacles the very next day. After Salvatore LaMonica was appointed as the Trustee for the TransCare estate, a representative from PPAS informed the Trustee that PPAS had foreclosed on all of TransCare's physical assets, including ambulances that were still on the road. However, the Trustee still owned the Certificates of Need (CONs) that were required to *operate* the ambulances. The PPAS representative informed the Trustee that TransCare could continue to operate the ambulances as long as the Trustee reached an agreement with Tilton and Transcendence.

But that was not the end of the Tilton Plan's problems. TransCare had $1.2 million in payroll obligations scheduled for the next day, and it was $200,000 short. The Trustee made clear that he would not agree to operate TransCare unless he could pay its employees, but neither Wells Fargo nor the Patriarch Entities were willing to provide any more money to close this shortfall.

The final nail in the coffin came the following day, when the Trustee visited TransCare's corporate headquarters and found the president of Transcendence

21-2547; 21-2576
*In re TransCare Corporation*

attempting to take possession of a computer server that Transcendence needed to operate. The Trustee refused to surrender the server because it contained "all of [TransCare's] books and records." Joint App'x 611. That evening, Tilton concluded that Transcendence was a lost cause. She instructed the company to cease all operations and issued a notice of termination to all of its employees. On March 10, PPAS and Transcendence transferred the Subject Collateral back to the Trustee. The collateral was liquidated, and its sale yielded $1.2 million for the TransCare estate.

## IV.   Procedural History

In February 2018, the Trustee initiated proceedings against Tilton and her companies in the Bankruptcy Court for the Southern District of New York. The Trustee brought (*inter alia*) a fraudulent conveyance claim against PPAS and Transcendence (referred to by the parties collectively as the Patriarch Entities), and a breach-of-fiduciary-duties claim against Tilton. After a six-day bench trial, the bankruptcy court (Bernstein, *J.*) issued an exhaustive 100-page "Findings of Fact and Conclusions of Law" that concluded that the Patriarch Entities had engaged in an actual fraudulent conveyance as defined by the bankruptcy code. The

15

bankruptcy court also recommended finding that Tilton had violated her fiduciary duties of loyalty and good faith.

Tilton and the Patriarch Entities filed objections to the bankruptcy court's recommendations and appealed the bankruptcy court's decisions to the district court. In September 2021, the district court (Kaplan, *J.*) issued an opinion that (1) upheld the bankruptcy court's liability determination as to the fraudulent conveyance claim against the Patriarch Entities, and (2) adopted its recommendation that Tilton be found liable for breaching her fiduciary duty to TransCare.

The bankruptcy court and the district court calculated the parallel damages owed to the TransCare estate by looking to the lost going-concern value of the divisions that were part of the Subject Collateral. Once the bankruptcy court concluded that the Patriarch Entities were liable for the fraudulent transfer, it calculated the damages owed to the TransCare estate by using the February 2016 financial projections, which forecasted an annualized EBITDA of $4 million. The bankruptcy court also looked to the December 2015 analysis of comparable companies to arrive at an average "EBITDA multiple" of 10.1x. Bankr. Op. at *25; *see also id.* at *31. Using these estimates, the bankruptcy court calculated the lost

going-concern value to be $40.4 million. It then subtracted the liquidation value of the Subject Collateral ($1.2 million) to arrive at a damages award of $39.2 million. *Id.* at *31–32.

The district court took a similar approach to calculating Tilton's liability for breaching her fiduciary duty. The court used the same valuation method to arrive at the $39.2 million figure but further subtracted another $1 million to account for the estimated "buyer capital investment," or the amount of money that a buyer would have to invest for the Subject Collateral to succeed as a going concern. Distr. Op. at *16; *see also id.* at *15. Thus, the district court concluded that Tilton owed the bankruptcy estate $38.2 million for the breach of her fiduciary duties, and the Patriarch Entities owed $39.2 million for the fraudulent transfer. *Id.* at *16, *19. Because these are parallel theories of liability with respect to the same injury, the district court limited the Trustee to only a single satisfaction. *Id.* at *20.

Tilton and the Patriarch Entities appealed.

## STANDARD OF REVIEW

The Trustee's actual-fraudulent-conveyance claim was a "core" bankruptcy proceeding brought under the Bankruptcy Code and New York law. *See U.S. Lines v. Am. Steamship Owners Mut. Prot. & Indem. Ass'n, Inc.* (*In re U.S. Lines, Inc.*), 197

21-2547; 21-2576
*In re TransCare Corporation*

F.3d 631, 636 (2d Cir. 1999). In such cases, "we review the bankruptcy court decision independently, accepting its factual findings unless clearly erroneous but reviewing its conclusions of law *de novo*." *Midland Cogeneration Venture Ltd. P'Ship v. Enron Corp.* (*In re Enron Corp.*), 419 F.3d 115, 124 (2d Cir. 2005).

The Trustee's fiduciary breach claim was a "non-core" bankruptcy proceeding. With respect to non-core claims, the bankruptcy court issues proposed findings of fact and conclusions of law that are reviewed *de novo* by the district court. *See In re U.S. Lines, Inc.*, 197 F.3d at 636. On appeal, we review the district court's findings of fact for clear error and its conclusions of law *de novo*. *See Harris Tr. & Sav. Bank v. John Hancock Mut. Life Ins. Co.*, 302 F.3d 18, 26 (2d Cir. 2002).

## DISCUSSION

### I. Liability

On appeal, Tilton challenges the district court's liability conclusion that she had breached her fiduciary duties by executing the Tilton Plan, and the Patriarch Entities challenge the bankruptcy court's liability conclusion that the Tilton Plan was an actual fraudulent transfer. We address each of these objections in turn.

### A. Breach of Fiduciary Duties

18

Tilton argues that her sale of the Subject Collateral to herself did not breach her fiduciary duties. Because TransCare and its subsidiaries were incorporated in Delaware, the breach of fiduciary duty claim against Tilton is governed by Delaware law. *Hausman v. Buckley*, 299 F.2d 696, 702–03 (2d Cir. 1962).

When a controlling shareholder engages in a self-dealing transaction without approval by the company's independent board, the transaction constitutes a breach of the shareholder's fiduciary duties unless it satisfies Delaware's "entire fairness" standard. *Weinberger v. UOP, Inc.*, 457 A.2d 701, 710 (Del. 1983). The entire fairness standard is "Delaware's most onerous standard and requires that the defendant prove that the transaction was the product of both *fair dealing* and *fair price*." *Burtch v. Opus, LLC (In re Opus E., LLC)*, 528 B.R. 30, 66 (Bankr. D. Del. 2015) (emphases added). The entire fairness standard is holistic and unitary, which means that the fairness of the process can affect the fairness of the price and vice versa. *See Kahn v. Tremont Corp.*, 694 A.2d 422, 432 (Del. 1997).

Tilton does not dispute that the foreclosure and the sale of the Subject Collateral was a self-interested transaction. Instead, she argues that the transaction met the entire fairness standard because it was a "product of both fair

19

dealing and fair price." *In re Opus E., LLC*, 528 B.R. at 66. We conclude that Tilton has failed to satisfy either prong of the entire fairness standard.

### 1. Fair Dealing

Fair dealing "embraces questions of when the transaction was timed, how it was initiated, structured, negotiated, disclosed to the directors, and how the approvals of the directors and the stockholders were obtained." *Weinberger*, 457 A.2d at 711. Fair dealing typically requires procedural protections such as appointing an independent special committee to assess the transaction or obtaining the consent of disinterested stockholders. *See, e.g., Reis v. Hazelett Strip-Casting Corp.*, 28 A.3d 442, 464 (Del. Ch. 2011) (finding a violation of fair dealing where "[p]rocedural protections were not implemented, and no one bargained for the minority"); *Strassburger v. Earley*, 752 A.2d 557, 576–77 (Del. Ch. 2000) (finding an absence of fair dealing because the negotiating and decision making processes lacked "any independent representation of the interests of [the corporation's] minority public stockholders").

We agree with the courts below that "'[t]here was nothing fair about the process through which Tilton effectuated' the foreclosure and sale of the Subject Collateral to Transcendence." Distr. Op. at *9 (quoting Bankr. Op. at *20). This

21-2547; 21-2576
*In re TransCare Corporation*

legal conclusion is reviewed *de novo*, but the underlying factual findings are reviewed for clear error. The district court found that Tilton "presented no evidence of true arms-length bargaining designed to protect the interests of the company and/or the minority shareholders," engaged in "no review by a disinterested party, independent director, or independent financial advisor," and "presented no evidence that she considered any alternative other than selling the Subject Collateral . . . to herself." *Id.* Tilton does not demonstrate that any of these findings were clear error.

Tilton claims she engaged in fair dealing because (1) she retained Carl Marks as independent consultants to facilitate the sale of TransCare and followed several of its recommendations; (2) she kept "essential stakeholders" (namely, Wells Fargo) apprised of her decisions; (3) she intended to give the Term Loan Lenders approximately 45% of Transcendence's equity; and (4) after she decided bankruptcy was inevitable in February 2016, there was no time or reason to consider alternatives to the Tilton Plan, since no third party would have been willing to buy the Subject Collateral in the relevant time frame. Appellant's Br. 47–49. However, each of these objections misses the mark.

21

21-2547; 21-2576

*In re TransCare Corporation*

*First*, Tilton's retention of Carl Marks is irrelevant to the fair dealing analysis. "Carl Marks indisputably was not hired to find a buyer or investor." Distr. Op. at *9 n.81 (cleaned up). The firm was instead hired to prepare a budget that would help TransCare obtain bridge financing from Wells Fargo until Tilton found a third-party buyer. Joint App'x 307. Thus, the question of whether Tilton paid heed to Carl Marks' budgetary advice has no bearing on whether she engaged in fair dealing.

*Second*, Tilton cannot demonstrate that she protected disinterested stakeholders by pointing to her communications with Wells Fargo. After all, "Credit Suisse—the largest minority shareholder—not only apparently was left in the dark throughout the process, but Tilton actively misled them about whether and how the wind-down of OldCo was being financed." Distr. Op. at *9. Tilton argues that her deception of Credit Suisse is "irrelevant because foreclosure of the Subject Collateral did not require Credit Suisse's consent." Appellant's Br. 50. But the very purpose of the fair dealing standard is to protect minority shareholders who are, by definition, not needed to approve a transaction. *See In re LNR Prop. Corp. S'holders Litig.*, 896 A.2d 169, 176 (Del. Ch. 2005). Accepting Tilton's argument would create an exception to fair dealing that would swallow the rule.

22

*Third*, Tilton's purported intent to give the Term Loan Lenders a 45% stake in Transcendence is neither dispositive in a fair dealing analysis nor clearly supported by the record. Even if Tilton did intend to give the Term Loan Lenders a stake in Transcendence at a later time, that would have little bearing on the *procedural* fairness of the transaction, because the bargaining process was still devoid of any opportunity for the independent shareholders to advocate for themselves. Moreover, it is not clear that the Term Loan Lenders would even have received this stake. The district court found that "there is no contemporaneous evidence of [Tilton's intent] other than a draft spreadsheet, apparently maintained internally by Patriarch Partners," and concluded that "Tilton's self-serving testimony that she would have given them a stake in [Transcendence] is not persuasive." Distr. Op. at *9 n.80. Based on the record before us, we cannot conclude that the court's findings were clearly erroneous. Even the members of Tilton's inner circle did not know of her purported intent to share Transcendence's equity when they implemented the Tilton Plan. *See* Joint App'x 438–39, 515–17.

Tilton's fourth and final argument for fair dealing is her strongest, but it too is unavailing. She contends that the district court erred "by faulting [her] for not undertaking a third-party sale process that was . . . infeasible due to TransCare's

daily unravelling and lack of any committed funding," Reply Br. 21, and claims that "no third party would have purchased TransCare's debt-saddled lines [in February 2016] without up-to-date financial statements or due diligence," Appellant's Br. 50.

While it is certainly true that TransCare was in bad shape in February 2016, it does not follow that the unusual, self-dealing process Tilton undertook was the only viable pathway. Both the district court and the bankruptcy court acknowledged that "TransCare was rapidly declining and time was running out." Bankr. Op. at *19; *see also* Distr. Op. at *10. Nevertheless, the district court found that Tilton could have explored other pathways for a sale of the Subject Collateral. For example, "a strategic third party [may] have been willing to buy certain of [TransCare's] more profitable and less risky business lines at that time, *even if* such a transaction called for a condensed timeline and/or minimal due diligence." Distr. Op. at *10. (emphasis added) (internal quotation marks omitted).

Tilton claims that this would not have been feasible given that "*every* TransCare division was either a borrower or guarantor of [TransCare's] debt, and the lenders' blanket liens applied to *each* division's assets." Reply Br. 18. But this argument "ignores the fact that Tilton sold the Subject Collateral free and clear of

24

any liens to herself *without the consent of anyone* by causing PPAS to foreclose on it and subsequently transfer it to Transcendence." Distr. Op. at *10. Tilton's own actions belie her argument that these profitable business lines were too "debt-saddled" to be saleable to a third party.

Tilton also argues that a third-party sale would have been impossible because "[t]he only third party interested enough to send a non-binding letter of intent expressly conditioned any offer on satisfactory due diligence." Appellant's Br. 41 (citing Joint App'x 1205). But it bears emphasizing that at no point did Tilton even *try* to solicit any other offer from a third party. In fact, she forbade her staff from pursuing any sales. Tilton points to a single, unsolicited opening offer as conclusive proof that nobody would have been willing to buy the Subject Collateral on a compressed timeframe with less due diligence. This evidence is not sufficient to demonstrate that the district court's factual findings were clear error. Tilton cites *Oberly v. Kirby*, 592 A.2d 445, 470–71 (Del. 1991), to support her argument that she was not required to explore alternative transactions with "obvious drawbacks." Appellant's Br. 39. However, that case found that a failure to explore alternative possibilities was not probative of unfair dealing because the

25

negotiations at issue were "lengthy, vigorous, and arm's length." *Oberly*, 592 A.2d, at 470. No such procedural protections existed here.

Tilton's arguments ultimately amount to a contention that she had only two options available to her in February 2016: liquidation or the Tilton Plan. She asks us to conclude that her willingness to invest $10 million of her own money in acquiring Transcendence tells us nothing about whether a third party would have also been willing to acquire TransCare's profitable assets. However, Delaware courts have observed that "the contemporaneous views of financial professionals who make investment decisions with real money" are an "informative source of probative evidence" because "people who must back their beliefs with their purses are more likely to assess the value of the judgment accurately than are people who simply seek to make an argument." *In re Appraisal of Dole Food Co., Inc.*, 114 A.3d 541, 557–58 (Del. Ch. 2014) (cleaned up). The district court rejected Tilton's characterization of TransCare's sales prospects, and we see no reason to overturn its finding as clearly erroneous.

## 2. Fair Price

The fair price aspect of an entire fairness analysis requires the proponent of a self-dealing transaction to demonstrate that "the price offered was the highest

value reasonably available under the circumstances." *Cinerama, Inc. v. Technicolor, Inc.*, 663 A.2d 1156, 1163 (Del. 1995) (citation omitted). When determining whether a seller received a fair price, "an initial decision to be made is whether to value the assets on a going concern basis or a liquidation basis." *Am. Classic Voyages Co. v. JP Morgan Chase Bank (In re Am. Classic Voyages Co.)*, 367 B.R. 500, 508 (Bankr. D. Del. 2007). Going-concern value is defined as "[t]he value of a commercial enterprise's assets . . . as an active business with future earning power," and liquidation value is "[t]he value . . . of an asset when it is sold in liquidation." *Value*, Black's Law Dictionary (11th ed. 2019). "If liquidation in bankruptcy was not 'clearly imminent' on the transfer date, then the entity should be valued as a going concern." *Am. Classic Voyages*, 367 B.R. at 508 (quoting *Travelers Int'l AG v. Trans World Airlines, Inc. (In re Trans World Airlines, Inc.)*, 134 F.3d 188, 193 (3d Cir. 1998)).

Tilton did not use either of these valuation methodologies to arrive at her $10 million purchase price for the Subject Collateral; instead, she relied on the book value of TransCare's assets to arrive at her estimate. "Book value tends to undervalue a business as a going concern because it does not fully account for intangible value attributable to the operations." *Reis*, 28 A.3d at 476.

27

Tilton does not contend that her use of book value was appropriate here, but she argues that it was error for the district court to compare the sale price of $10 million to the *going concern* value of the Subject Collateral instead of the *liquidation* value. Patriarch Partners' internal projections estimated that the Subject Collateral could generate an EBITDA of $4 million annually (which, as discussed *infra* at Part II, leads to a going concern valuation well above $10 million). But because TransCare was on its deathbed by February 2016, Tilton contends that the court should have used liquidation value as the yardstick for its fair price analysis. She claims $10 million was a fair price for the Subject Collateral because it was more than eight times the liquidation value of $1.2 million.

Once again, this argument turns on a factual question: whether the Subject Collateral had value as a going concern as of February 2016. It was not clear error for the district court to conclude that it did. Although the parties agree that TransCare *as a whole* was on its deathbed, that does not mean that the most profitable divisions within TransCare were in the same position. Those divisions, not TransCare as a whole, were the subject of the transaction and therefore of the courts' fair price analysis. Tilton herself admitted that the Subject Collateral had

going-concern value when she emailed an insurer and communicated her intent to operate those divisions "in a new company." Joint App'x 1438.

Nevertheless, Tilton cites the *New Haven Inclusion Cases* for the proposition that creditors cannot "treat [a company] as a liquidating enterprise with respect to certain items and as an operating [business] with respect to others, depending on which approach happens to yield the higher value." 399 U.S. 392, 482 (1970). In that decision, the Supreme Court rejected a claim by bondholders that "Penn Central should pay an *added* amount to reflect the going-concern value of the [company]. This sum, it is stressed, would be calculated, *not as an alternative to liquidation value, but as a supplement to it.*" *Id.* at 481 (emphases added) (internal quotation marks omitted). A footnote goes on to say that two of the cases the bondholders relied upon were inapposite, because "[i]n neither of these cases did the New York courts require the taking authorities to pay *both* an operating and a liquidating value." *Id.* at 483 n.80 (emphasis added).

Thus, when read in context, the *New Haven Inclusion Cases* stand for the relatively narrow proposition that stakeholders are not entitled to collect both liquidation value *and* going concern value for a company's assets. Here, the Trustee argues that going concern value, *not* liquidation value, is the proper

measure of the Subject Collateral's value. That argument is not foreclosed by *New Haven*.

Tilton also argues that the Subject Collateral could not have had going-concern value to anyone other than herself by February 2016. *See* Reply Br. 13 ("Unlike any third party, Tilton needed no financial statements or due diligence."). She essentially repackages her claim that her willingness to buy the Subject Collateral for $10 million says nothing about its value to a third party. But as the district court noted, Tilton has not met her burden to prove this claim because "[h]er outright refusal to consider the possibility of selling any of TransCare's business lines undermined any chance that the company had at a third-party sale." Distr. Op. at *11. In other words, Tilton's failure to implement a fair process undermines her ability to demonstrate that she had obtained a fair price and renders her argument "conclusory and circular." *Id; see also S. Muoio & Co. LLC v. Hallmark Ent. Invs. Co.*, No. 4729-cc, 2011 WL 863007, at *16 (Del. Ch. Mar. 9, 2011) ("[T]he fair price inquiry has most salience when the controller has established a process that simulates arms-length bargaining, supported by appropriate procedural protections." (cleaned up)), *aff'd*, 35 A.3d 419 (Del. 2011). Under the entire fairness standard, the burden rests on Tilton to show "no better

alternatives." *In re Latam Airlines Grp. S.A.*, 620 B.R. 722, 791 (Bankr. S.D.N.Y. 2020) (relying on Delaware law).  Tilton cannot meet that burden because she failed to consider any pathway that she did not fully control.

For these reasons, the district court did not err in concluding that Tilton had failed to demonstrate fair dealing *or* fair price.  We therefore affirm the court's conclusion that Tilton breached her fiduciary duties to TransCare when she executed the Tilton Plan.

## B.    Fraudulent Conveyance

The bankruptcy court concluded that the foreclosure and sale of the Subject Collateral constituted an actual fraudulent conveyance under federal and New York law.  Under 11 U.S.C. § 548(a)(1)(A) and N.Y. Debt. & Cred. L. § 276, "a bankruptcy trustee [may] recover fraudulent transfers . . . made with actual intent to hinder, delay, or defraud creditors."  *Kirschner v. Large S'holders* (*In re Trib. Co. Fraudulent Conv. Litig.*), 10 F.4th 147, 159 (2d Cir. 2021) (cleaned up), *cert. denied sub nom. Kirschner v. FitzSimons*, 142 S. Ct. 1128 (2022); *see also Sharp Int'l Corp. v. State St. Bank & Tr. Co.* (*In re Sharp Int'l Corp.*), 403 F.3d 43, 56 (2d Cir. 2005).  "[A]n intent to hinder or delay is adequate even if it be not an intent to defraud."  *In re Condon*, 198 F. 947, 950 (S.D.N.Y. 1912) (Hand, *J.*), *aff'd*, 209 F. 800 (2d Cir. 1913).

The parties do not dispute that the foreclosure was a transfer of TransCare's property, or that Tilton's subjective intent can be imputed to TransCare. Thus, the key question in determining liability is whether the Trustee met his burden to prove Tilton's *scienter*.

Because "[a] transferor rarely admits her own fraudulent intent," Bankr. Op. at *30, courts look to the following "badges of fraud" to ascertain an intent to hinder, delay, or defraud:

(1) the lack or inadequacy of consideration;

(2) the family, friendship, or close associate relationship between the parties;

(3) the retention of possession, benefit or use of the property in question;

(4) the financial condition of the party sought to be charged both before and after the transaction in question;

(5) the existence or cumulative effect of a pattern or series of transactions or course of conduct after the incurring of debt, onset of financial difficulties, or pendency or threat of suits by creditors; and

(6) the general chronology of the events and transactions under inquiry.

*Salomon v. Kaiser* (*In re Kaiser*), 722 F.2d 1574, 1582–83 (2d Cir. 1983). Fraudulent intent can also be inferred from the "secrecy, haste, or unusualness of the transaction," *HBE Leasing Corp. v. Frank*, 48 F.3d 623, 639 (2d Cir. 1995), or "the concealment of facts and false pretenses by the transferor." *In re Trib.*, 10 F.4th at

160 (internal quotation marks omitted). "While the presence or absence of one badge of fraud is not conclusive," "the confluence of several can constitute conclusive evidence of an actual intent to defraud, absent 'significantly clear' evidence of a legitimate supervening purpose." *Kirschner v. Fitzsimons* (*In re Trib. Co. Fraudulent Conv. Litig.*), No. 12-cv-2652, 2017 WL 82391, at *13 (S.D.N.Y. Jan. 6, 2017) (cleaned up), *aff'd*, 10 F.4th 147 (2d Cir. 2021).

The bankruptcy court concluded that "[v]irtually all of the badges of fraud identified [in the case law] are present in this case[,] providing strong circumstantial evidence of Tilton's fraudulent intent." Bankr. Op. at *30. We agree. As the prior sections have already established, Tilton: failed to demonstrate that $10 million was a fair price for the Subject Collateral; sold the Collateral to herself; maintained control of the Collateral at all times in the transaction; retained the most valuable parts of her business, free and clear of any liens; executed all of the transfers after the onset of financial difficulties; conducted the entire transaction hastily; and kept key stakeholders in the dark.

The Patriarch Entities do not dispute that these badges were present, but they make two other arguments for reversal. As a threshold matter, they claim the district court erred in reviewing the bankruptcy court's fraudulent-intent

33

determination for clear error, when it should have been reviewed *de novo*. Next, they argue that the lower courts ignored evidence of Tilton's intent to benefit creditors and save jobs. The Patriarch Entities also ask us to adopt a two-step test that would allow them to rebut the presumption of fraudulent intent by establishing a legitimate supervening purpose. We address these arguments in turn.

The Patriarch Entities begin by citing *United States v. McCombs* for the proposition that a reviewing court should review "the [lower] court's ultimate conclusion that the conveyance was fraudulent under section 276 *de novo* as an issue involving the application of law to fact." 30 F.3d 310, 328 (2d Cir. 1994). However, *McCombs* is not on all fours, and a closer look at the decision actually belies their assertion. In McCombs we said: "Were the fraudulent conveyance inquiry merely a battle between the 'badges' on one hand and inferences of [the transferor's] nonfraudulent motivation on the other, we would be reluctant to disturb the [trial] judge's finding of actual fraudulent intent." *Id*. But in *McCombs*, the trial judge's finding of fraudulent intent was premised on a finding that "was flawed *both legally and factually*." *Id*. (emphases added). Thus, *McCombs* suggests

that a finding of fraudulent intent is reviewed for clear error, *unless* that finding is premised on a legal error.

This reading is consistent with our approach in the cases that followed *McCombs*. *See, e.g., The Cadle Co. v. Smith* (*In re Smith*), 321 F. App'x 32, 32 (2d Cir. 2009) (summary order) ("The question of whether Debtor acted with intent to hinder or defraud his creditors is a question of fact."); *United States v. Evseroff*, 528 F. App'x 75, 77 (2d Cir. 2013) (summary order) (reviewing "*de novo* the district court's determination that Evseroff's transfers to the Trust were actually fraudulent," but reviewing the "factual findings underpinning those legal determinations" for "clear error"). It is also consistent with the decisions of our sister circuits. *See, e.g., Harman v. First Am. Bank of Md.* (*In re Jeffrey Bigelow Design Grp., Inc.*), 956 F.2d 479, 481 (4th Cir. 1992) ("For a finding of fraudulent intent in an actual fraudulent transfer, a reviewing court must apply a clearly erroneous standard."); *Wiggains v. Reed* (*In re Wiggains*), 848 F.3d 655, 660–61 (5th Cir. 2017) (same); *Brown v. Third Nat'l Bank* (*In re Sherman*), 67 F.3d 1348, 1353 (8th Cir. 1995) (same); *Acequia, Inc. v. Clinton* (*In re Acequia, Inc.*), 34 F.3d 800, 805 (9th Cir. 1994) (same). Therefore, we conclude that the district court was correct to review the bankruptcy court's finding of fraudulent intent for clear error.

35

Applying the clear error standard of review, we conclude that the evidence of Tilton's good faith is too weak to reverse the bankruptcy court's determination that she acted with fraudulent intent.

To start, the Patriarch Entities urge us to adopt a formal two-step inquiry that allows evidence of a legitimate purpose to overcome a presumption of fraud. The bankruptcy court shared this view of the test, noting that "the confluence of several [badges] can constitute conclusive evidence of an actual intent to defraud, *absent significantly clear evidence* of a legitimate supervening purpose." Bankr. Op. at *30 (emphasis added) (cleaned up). However, even if we were to adopt this test, the evidence of Tilton's good faith would be too slight for the Entities to prevail at step two.

The Patriarch Entities first highlight an exchange that occurred during the bench trial, in which the Trustee's counsel was asked for evidence of Tilton's subjective intent. The Trustee's Counsel responded: "I don't know that we would say that she wasn't acting with an honest intention to reorganize or save the company." Joint App'x 822–23. The Entities claim that this concession by itself warrants a reversal. However, Tilton's intention to save the company is nonetheless compatible with a finding that she "intended also to hinder or delay

TransCare's other creditors—even if just temporarily to restore affairs." Distr. Op. at *18. Because "an intent to hinder or delay is adequate even if it be not an intent to defraud," this concession does not get the Patriarch Entities very far. *Condon*, 198 F. at 950.

The Patriarch Entities also call attention to Tilton's testimony that she tried "to collect as much as possible not only for Wells, but also for the remaining term lenders." Joint App'x 748. They argue that her good faith is corroborated by her correspondence with Carl Marks and Wells Fargo, which "repeatedly stated her intent to save jobs and repay creditors," and the Patriarch Partners spreadsheet, which noted that the Term Loan Lenders would receive 45% of Transcendence. Appellant's Br. 29–30.

Once again, the Patriarch Entities paint an incomplete picture of the events leading to the Tilton Plan. They omit the fact that Credit Suisse—the largest minority shareholder—was actively misled about the details of the restructuring. They also fail to mention that "there was no evidence that Tilton consulted or informed Wells Fargo before foreclosing on the Subject Collateral." Distr. Op. at *6. The record does not contain evidence that Tilton told the other Term Loan Lenders of her intent to give them a minority stake in Transcendence. Nor were

members of her own inner circle cued in on this plan. In light of these facts, it was not clear error for the bankruptcy court to conclude that Tilton acted with the intent to hinder, delay, or defraud creditors.

We therefore affirm the bankruptcy court's determination that Tilton executed the transfer of the Subject Collateral with the intent to hinder, delay, or defraud the other TransCare creditors. Because we conclude that both Tilton and the Patriarch Entities are liable for the transfer of the Subject Collateral, we now turn to the lower courts' calculations of damages.

## II.    Damages

Tilton and the Patriarch Entities raise several general objections to the damages calculations. They argue that both courts "erred in measuring damages based on the Subject Collateral's purported going concern value," instead of the liquidation value. Appellant's Br. 51. They also claim that the lower courts improperly shifted the burden of proof for damages onto them, instead of the Trustee. And finally, they contend that the Trustee cannot be awarded the going-concern value of the Subject Collateral, because he was responsible for Transcendence's failure to launch. According to the defendants, these purported errors require us to modify the overall damages award from $39.2 million to $0.

21-2547; 21-2576
*In re TransCare Corporation*

We are unconvinced. We begin with an overview of the applicable legal standard before turning to the parties' arguments.

When a fiduciary breaches her duty of loyalty, "Delaware law dictates that the scope of recovery . . . is not to be determined narrowly." *Thorpe ex rel. Castleman v. CERBCO*, 676 A.2d 436, 445 (Del. 1996). "The strict imposition of penalties under Delaware law are designed to discourage disloyalty." *Id.* Accordingly, courts have the "very broad" power to fashion damages "as may be appropriate, including rescissory damages." *Int'l Telecharge, Inc. v. Bomarko, Inc.*, 766 A.2d 437, 440 (Del. 2000). The plaintiff bears the burden of proving damages by a preponderance of the evidence, but "Delaware does not require certainty in the award of damages where a wrong has been proven and injury established." *Beard Rsch., Inc. v. Kates*, 8 A.3d 573, 613 (Del. Ch. 2010) (quotation marks omitted), *aff'd sub nom. ASDI, Inc. v. Beard Rsch., Inc.*, 11 A.3d 749 (Del. 2010).

When a fraudulent transfer is avoided, the Bankruptcy Code provides that "the trustee may recover, for the benefit of the estate, the property transferred, or, if the court so orders, the value of such property." 11 U.S.C. § 550(a). "The purpose of § 550(a) is to restore the estate to the condition it would have been in if the transfer had never occurred." *Sec. Inv. Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC,*

39

21-2547; 21-2576
*In re TransCare Corporation*

568 B.R. 481, 486 (Bankr. S.D.N.Y. 2017). "The question of the amount of recoverable damages is a question of fact . . . review[ed] for clear error." *Bessemer Tr. Co., N.A. v. Branin*, 618 F.3d 76, 85 (2d Cir. 2010) (quotation marks omitted).

Once again, the defendants argue that a sale of the Subject Collateral would have been impossible, and therefore no harm flowed to the estate as a result of the foreclosure. We are unconvinced by these points for essentially the same reasons covered above.

It was not clear error for the courts to find that the Subject Collateral could have been sold for substantially more than liquidation value if Tilton had attempted to sell the Collateral to anyone but herself. Tilton had received numerous unsolicited offers to buy part or all of TransCare as late as December 2015. She handpicked the business lines that were part of the Subject Collateral after a thorough review of TransCare's finances, and she chose them precisely because she believed they had value as a going concern. Tilton argues that TransCare was too distressed for a sale to be possible in February 2016, but the Trustee's expert specifically compared the business lines in the Subject Collateral to other "smaller, distressed, low operating, or undercapitalized" companies when he arrived at his damages estimate. Distr. Op. at *14. Tilton "did not offer any

40

substantive evidence of how [the expert] failed to account for risks, made inappropriate assumptions, used incomplete or inaccurate financial information, or excluded comparable companies." *Id.* at *15.

We are similarly unpersuaded by the defendants' claim that the courts committed "legal error" by shifting the burden of proof onto them. As the district court noted, "determining damages for breach of fiduciary duty 'unavoidably requires the court to make judgments concerning liability and other contingencies' based on its responsible estimate of what would have happened if the defendant had not acted disloyally." Distr. Op. at *13 (quoting *Bomarko*, 766 A.2d at 441). In this case, the Trustee had the burden of proof, which he met by providing expert projections based on the evidence available to him. The defendants failed to rebut it or provide their own estimate of damages. Accepting the Trustee's estimate in the absence of compelling rebuttal evidence is not the same as placing the burden of proof on the defendants.

Next, the defendants argue that the fraudulent conveyance award was improper because the *Trustee*, not Tilton, was responsible for the Subject Collateral's loss of going-concern value. The defendants claim that "the Trustee himself smothered Transcendence in the crib the day it was born" by refusing to

turn over the TransCare computer servers.  Appellant's Br. 59.  But regardless of

who was responsible for Transcendence's downfall, the lower courts' damages

calculations were not erroneous.  We have explained that "breaches of a fiduciary

relationship . . . comprise a special breed of cases that often loosen normally

stringent requirements of causation and damages."  *Milbank, Tweed, Hadley &*

*McCloy v. Boon*, 13 F.3d 537, 543 (2d Cir. 1994).  This is because "[a]n action for

breach of fiduciary duty is a prophylactic rule intended to remove all incentive to

breach—not simply to compensate for damages in the event of a breach."  *ABKCO*

*Music, Inc. v. Harrisongs Music, Ltd.*, 722 F.2d 988, 995–96 (2d Cir. 1983).  Similarly,

"when property declines in value after the [fraudulent] transfer, a trustee may

recover the value of the property *at the time of the transfer* rather than the property."

5 Collier on Bankruptcy ¶ 550.02[3][a] (16th ed. 2022) (emphasis added).  This is

true even if "[d]epreciation in the value of the property" occurs for reasons outside

of the transferor's control, such as "market fluctuations."  *Id.*  Therefore, the courts

did not err by awarding the Trustee the value of the Subject Collateral at the time

of the transfer.

Finally, the Patriarch Entities raise a challenge specific to the fraudulent

transfer award.  They contend that awarding any damages once the Subject

Collateral was returned was legal error because § 550(a) of the Bankruptcy Code permits the Trustee to recover only "the property transferred, or [its] value." 11 U.S.C. § 550(a). However, the bankruptcy court subtracted the liquidation value of the Subject Collateral from the going concern value to ensure that there was only a single recovery. *See Jones v. The Brand L. Firm, P.A.* (*In re Belmonte*), 931 F.3d 147, 154 (2d Cir. 2019) ("Section 550(a) authorizes the Trustee to pursue recovery from all available sources until the full amount of unlawfully transferred Estate property is fully realized for the Estate's creditors."). Awarding the value of the Subject Collateral was also appropriate because its value depreciated significantly after the fraudulent transfer. *See Andrew Velez Constr., Inc. v. Consol. Edison Co. of N.Y.* (*In re Andrew Velez Constr., Inc.*), 373 B.R. 262, 274 (Bankr. S.D.N.Y. 2007).

In sum, we find no error in the damages award of $39.2 million for the fraudulent conveyance or the award of $38.2 million for the breach of fiduciary duties.

\*     \*     \*

After oral argument, we ordered supplemental briefing on whether the damages awards resulted in a double recovery to the Trustee for the value of the Certificates of Need, which were not part of the Subject Collateral. We also asked

the parties to explain whether that objection was raised by the defendants at any stage of the proceedings. The letters submitted by the parties confirmed that the defendants failed to raise this argument before the bankruptcy court, the district court, or this Court.

The dissenting opinion concludes that this objection was fairly encompassed within the defendants' broader argument that the Trustee obtained a double recovery by receiving the Subject Collateral and its going-concern value, even after subtracting its liquidation value. *Post* at 4-6. But that argument, which we have rejected here, is not just broader. It is meaningfully distinct from, and even at odds with, the argument that the Trustee was entitled to that recovery but that the bankruptcy court made an error in failing to subtract some items already accounted for. The defendants did not advance that latter argument.

"In our adversarial system of adjudication, we follow the principle of party presentation," and courts are assigned "the role of neutral arbiter of matters the parties present." *United States v. Sineneng-Smith*, 140 S. Ct. 1575, 1579 (2020). Accordingly, courts "do not, or should not, sally forth each day looking for wrongs to right. They wait for cases to come to them, and when cases arise, courts normally decide only questions presented by the parties." *Id.* (cleaned up). To be

sure, this rule is not "ironclad": courts have "depart[ed] from the party presentation principle . . . to protect a *pro se* litigant's rights," or in criminal cases where significant liberty interests are at stake. *Id.* (internal quotation marks omitted). Thus, we have explained that we may address an abandoned issue if the "issue is necessary to avoid manifest injustice or . . . is purely legal and there is no need for additional fact-finding." *United States v. Gomez*, 877 F.3d 76, 92 (2d Cir. 2017).

This case does not meet either of those criteria. *First*, the new double-counting argument requires the court to engage in factfinding, and it is therefore not "purely legal." *Id.* Determining which Certificates of Need were double-counted requires an independent search of the record to determine which Certificates were necessary to operate Transcendence. And *second*, the arguments are not necessary to avoid "manifest injustice." The parties in this case were on notice about the damages calculations at all stages of litigation, and they were represented by exceptionally able counsel who have demonstrated a thorough command of the record. Perhaps for strategic reasons, defense counsel focused its appeal on arguments that would reverse liability or vacate the entire damages award. Further, any lingering skepticism regarding the damages awards we have

45

determined to be free from clear error, *see post* at 9, does not suggest "manifest injustice" here.

Therefore, in keeping with our role as "passive instruments of government," we limit our analysis to the issues the parties have asked us to review. *Sineneng-Smith*, 140 S. Ct. at 1579. Because the defendants did not raise below and have not raised on appeal the new double-counting issue with the Certificates of Need, we affirm the district court's damages award in full.

## CONCLUSION

The judgments of the district court and the bankruptcy court are **AFFIRMED**.

46